UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MARIA E. EATON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 04-131-B-W |
| | ) | |
| KINDRED NURSING CENTERS WEST, | ) | |
| LLC, d/b/a WESTGATE MANOR, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF DECISION ON MOTIONS TO STRIKE**

Maria E. Eaton has sued her former employer, Kindred Nursing Centers West, LLC for alleged national origin discrimination, pursuant to the Maine Human Rights Act, and for alleged whistleblower retaliation, pursuant to the Maine Whistleblower Protection Act and the Maine Human Rights Act. The defendant removed the state court action to this court based upon diversity of citizenship. Now pending is Kindred's motion for summary judgment against both claims. In opposition to the motion, Eaton does nothing to support her national origin discrimination claim, which I treat as therefore waived.[1] Based on my review of the motion for summary judgment, I conclude that Eaton fails to generate a trial-worthy issue and, accordingly, recommend that the court grant Kindred's motion for summary judgment. In the course of my discussion, I also dispose of two motions filed by Eaton in conjunction with her summary judgment opposition.

---

[1] Lest there is any doubt on this score, during her deposition testimony Eaton testified that she did not believe she was terminated from employment because of her Portuguese national origin. (Opposing Statement of Material Facts, Docket No. 12, ¶ 28, admitting Statement of Material Facts, Docket No. 9, ¶ 28.)

**Facts**

As with all summary judgment motions, the availability of any claim-dispositive ruling depends on the quality of the parties' factual proffers.  Because the only legal issue is whether Eaton has sufficient evidence to permit a jury to return a verdict in her favor on her claim of whistleblower retaliation, I recount only the facts that are material to that question.  To determine whether there is a trial-worthy issue, I review the parties' competing summary judgment statements of material fact under the auspices of this District's Local Rule 56, as outlined in Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004).

Defendant Kindred owns and operates Westgate Manor, a nursing home facility located in Bangor.  (Def.'s Statement of Material Facts (Statement), Docket No. 9, ¶ 1.)  For ease of reference, this decision will henceforth refer to both Kindred and its Westgate facility as "Westgate."  Westgate employed Maria Eaton as a certified nursing assistant (CNA) from approximately 1990 until her termination from employment on November 6, 2002.  During her employment, Eaton generally worked on the night shift from 11:00 p.m. to 7:00 a.m. (Statement ¶ 2.)  Eaton was often called upon by management to perform overtime hours.  She would typically work six nights a week, working eight to twelve hour shifts.  She was available and reported for duty when management called for someone to do overtime.  (Statement of Additional Material Facts (Additional Statement), Docket No. 12, ¶ 40.)

Michael Skirven was at all relevant times the Administrator/Executive Director of Westgate.  In this position, Skirven was responsible for overseeing all operations at Westgate, including resident care and staffing issues.  (Statement ¶ 4.)  Elaine Brown held the position of Director of Nursing at Westgate from the late 1980s through 2002, and she reported to Skirven.  Brown was responsible for all nursing care issues and nursing staff at Westgate.  (Id. ¶ 5.)

According to Brown, Eaton was an above-average CNA.  (Additional Statement ¶ 41.)  The quality of Eaton's experience at Westgate, in the broadest sense, began to decline in the spring of 2002 and continued to decline throughout the year until her eventual termination late in the fall. I attempt here to present that progression in chronological fashion.

In the spring of 2002, while babysitting the child of a certain co-worker named Lori, Ms. Eaton observed bruises on the child's body and made a telephone report of suspected child abuse to the Maine Department of Human Services (DHS).  (Additional Statement ¶ 42.)  Eaton testified that she subsequently informed Ms. Brown that she made a child abuse report concerning Lori.  According to Eaton, Brown responded by saying that Westgate did not provide day care services and that Brown could not address the matter because it occurred outside the facility.  (Statement ¶ 36; Additional Statement ¶ 43.)

In late June 2002, a hubbub arose in Kindred's workplace concerning the scheduling of shifts over the 4th of July holiday.  Deborah Mansell, a licensed practical nurse and charge nurse at the facility for nearly 20 years, scheduled one of Eaton's daughters, Monica Pires, to work on the 4th despite Pires's request to have the day off.  (Statement ¶¶ 10-11.)  Subsequently, someone made an unauthorized alteration to the work schedule to provide Pires with the day off.  (Id.) Brown and Mansell questioned Pires about the change and Pires took affront, believing she was being falsely accused of changing the schedule, and she voluntarily terminated her employment a short time thereafter.  (Id. ¶ 12.)  On the day she was spoken to by Brown and Mansell, Pires met with Eaton and told Eaton that Brown and Mansell were falsely accusing Pires of altering the schedule.  (Id.)  Sometime after that and while they were in the workplace, Eaton spoke with Mansell and stated, in Brown's presence, "Debbie, you said many times when you don't like

somebody you run them out of this place, and that's what you did to my Chris."[2]  (Id. ¶ 13; see also Eaton Depo., Docket No. 10, Elec. Attach. A at 92.)  At her deposition, Mansell testified that Eaton was very upset, emotional, and accusatory during this confrontation, and that she found Eaton's conduct to be threatening.  (Statement ¶ 13.)  Although they had been good friends for roughly ten years, the incident ruined their friendship.  (Id. ¶¶ 10, 13.)  Mansell also testified that, following the confrontation with Eaton, she felt threatened by various other comments or statements that Eaton made in the workplace.  For instance, Mansell testified that Eaton made comments of an intimidating nature in Mansell's presence, including comments that Eaton knew where Mansell lived and that Mansell's house had burned down many years ago.  Mansell also testified that her concern was heightened by the fact that on various occasions she heard Eaton openly boast that she had engaged in violent or threatening behavior in the past, such as slashing tires, stalking people, and placing sugar in gasoline tanks.  (Id. ¶ 14.)  At her deposition, Eaton denied ever making any such statements.  (Def.'s Opposing Statement of Material Fact (Opposing Statement), Docket No. 12, ¶ 14;  Additional Statement ¶ 61.)

According to Ms. Eaton, sometime in the summer of 2002 she called DHS to report that a co-worker had abused an elderly resident at Westgate Manor.  (Statement ¶ 29.)  Although Eaton did not observe the alleged abuse, she was told of the incident by other employees and also observed that the alleged victim had bruises and was missing a toenail shortly after the incident. (Id.; Opposing Statement ¶ 29; Additional Statement ¶ 44.)  The employee who informed Eaton of the incident was Ms. Annie Waldron, who directly witnessed the alleged abuse as it transpired.  (Statement ¶ 30.)  In addition to speaking with Eaton about the matter, Waldron notified her supervisor of the incident, who in turn notified Ms. Brown.  (Id.)  Due to the report, Brown conducted an internal investigation of the incident, examined the resident and found no

---

[2]      Eaton refers to Monica Pires as "Chris."

4

evidence that any abuse had occurred. (Id.) According to Eaton, she called DHS a week to a week and a half later to report the incident because it was her impression that Westgate's management was not taking care of the problem. (Additional Statement ¶ 45.) DHS performed an investigation at the facility sometime in late August 2002. (Id. ¶ 47.) How much time elapsed between the report and the investigation is not revealed in the parties' summary judgment papers.

Ms. Eaton never told Mr. Skirven, Ms. Brown or any supervisors at the Westgate facility that she had called in the abuse report to DHS. (Statement ¶ 31.) Nor was Eaton ever told by Skirven, Brown or any other supervisor that she was suspected of reporting the alleged abuse to DHS. (Id.) In late August 2002, a DHS employee came to Westgate to investigate the alleged abuse. (Id. ¶ 32.) According to Brown, the DHS investigator never discussed with Westgate management the identity of any employee who may have reported the incident. (Id.) Both Skirven and Brown testified that they did not suspect Eaton to be the employee who had reported the alleged abuse to DHS, but rather suspected Ms. Waldron, who had witnessed the underlying incident and who had also previously reported Westgate to the U.S. Occupational Safety and Health Administration in an unrelated matter. (Id. ¶¶ 32-33.)

On October 9, 2002, Ms. Eaton was suspended for one day for sleeping at work. (Statement ¶ 8; Additional Statement ¶ 52.) Although Eaton contends that the suspension was unwarranted because employees are permitted to take a nap if they are on break, she conceded in her deposition that she was not on a break when she was observed sleeping at work. (Additional Statement ¶ 51; Eaton Depo. at 144-45.)

Later in the fall of 2002, four or five night shift employees complained to Ms. Brown that they felt intimidated and harassed when working with Eaton because Eaton would not

communicate or speak with them, but would constantly hum and sing in their presence. (Statement ¶ 15.)  Brown spoke to Eaton and directed her to cease engaging in the reported behavior, but, according to Brown, the employees reported to her that Eaton continued to engage in the conduct.  (Id. ¶ 16.)  Also according to Brown, the night staff employees subsequently told her that if Ms. Eaton's behavior did not stop, they would quit their jobs because they could no longer tolerate Eaton's behavior.  (Id.)  According to Eaton, she always sang and hummed loudly in the morning during the entire time she was employed at Westgate.  (Additional Statement ¶ 62.)

Also in the fall of 2002 Ms. Mansell left work on one occasion and found that the hood of her car had been raised and that a light was on.  Mansell also reported that when she tried to start her car to leave work on one occasion in October and another occasion in early November, her car made a strange sound and then backfired loudly.  (Statement ¶ 17.)  Following the November incident, Mansell reported these strange happenings to the Bangor Police Department and based on her account, according to Mansell, a police officer advised her to file a complaint against Ms. Eaton for protection from harassment.  (Id. ¶ 18.)  Mansell then informed Ms. Brown and Mr. Skirven that she intended to follow the officer's advice.  (Id.)  Another Kindred employee, Angela Pickoski, also reported that her vehicle was vandalized in the nursing home's parking lot. According to Pickoski, she reported in October 2002 that her vehicle's tires were vandalized on two occasions.  (Id. ¶ 19.)  These events were reported to Skirven.  (Id. ¶ 20.)  Significantly, during her deposition Eaton acknowledged that a number of her co-workers believed that she was responsible for slashing Pickoski's tires.  (Id.)

In late October 2002, Mr. Skirven met personally with each Westgate employee working on the night shift (including Eaton) to discuss the recent vandalism in the parking lot.  (Statement

¶ 21; Additional Statement ¶ 56.)  During these meetings, Skirven issued each night shift employee copies of Westgate's work rules and its policy on workplace violence, and he emphasized that Westgate would not tolerate any further incidents of vandalism.  (Statement ¶ 21.)  Eaton testified that because she was being accused by her co-workers of slashing the tires on Ms. Pickoski's car, she decided on November 6, 2002, to go to the Bangor Police Department with another employee to obtain a copy of the incident report regarding Pickoski's vandalized car.  (Id. ¶ 22; Additional Statement ¶ 57.)  According to Skirven, sometime after Eaton's visit to the police department, he received a phone call from a Bangor police officer who reported that Eaton had acted bizarrely when she requested the incident report, and that she was laughing and giggling while she was there.  (Statement ¶ 23.)  Skirven testified that the police officer informed him that, based upon the reported incidents of vandalism and Eaton's alleged threatening comments to her co-workers, the officer believed Eaton was a potential threat to a co-worker. (Id.)  According to Kindred, its decision to terminate Eaton's employment was an outgrowth of these events.  According to Skirven's testimony, he believed that Eaton's continued employment at Westgate created a potential danger to staff, based on the police officer's assessment of the situation, Mansell's report that she felt she was being intimidated by Eaton, the night staff's fear of Eaton, including their alleged intentions to quit, and their reports that Eaton had failed to modify her behavior despite being directed to do so by Ms. Brown.  (Id. ¶ 24.)

On November 6, 2002, Ms. Brown called Eaton into the facility for a meeting.  (Id. ¶ 25; Additional Statement ¶ 58.)  When Eaton arrived, Mr. Skirven told her she was fired for creating a hostile work environment.  (Additional Statement ¶ 59.)  Also discussed at the meeting was the fact that Eaton went to the police department to look at Ms. Pickoski's police report.  (Id.)  It is plain from the relevant colloquy in Eaton's deposition transcript that other things were stated as

well. (Eaton Depo. at 217-219.) Eaton attempted to explain her presence at the police department by stating that she wanted to see if her name was mentioned in the tire slashing because she had nothing to do with the incident. (Additional Statement ¶ 59.) According to Eaton, Skirven "did nothing to investigate or follow-up the allegations of the other employees and simply chose to believe their story over [hers]." (Id. ¶ 71.) Either during or following the meeting, Ms. Brown wrote out a disciplinary action record in which she indicated that the grounds for terminating Eaton's employment were (1) creating a hostile work environment and (2) harassment. (Additional Statement ¶ 67.)

Ms. Eaton testified at her deposition that she believes Mr. Skirven and Ms. Brown knew that it was she who reported the alleged resident abuse to DHS. Eaton draws this conclusion because, according to her, she was called to either Skirven's or Brown's office on a "weekly basis" to be criticized on some aspect of her job performance following the report, but had never been called to the office in her prior 14 years of working for Westgate. (Additional Statement ¶ 55.) Elsewhere, however, Eaton asserts that both Skirven and Brown suspected Annie Waldron, and not Eaton, because Waldron had previously reported Westgate to OSHA. (Additional Statement ¶¶ 68, 71.) Other than saying she was "called into the office" weekly, Eaton does not itemize the specific occasions or the kinds of issues that were raised in her statement of additional facts. (Id. ¶ 56.) Westgate has made some effort in this regard, stating that one occasion involved the parking lot vandalism matter, for which every employee on the night shift was called in and issued a copy of the facility's policy on harassment. (Statement ¶ 35.) Another incident involved Eaton's use of vulgarity, which she admits to using on the date in question. (Id.) Third is the incident in which Eaton fell asleep at her post. There also appears to have been a fourth incident involving Eaton's absence from her unit, but she was cleared of any wrongdoing

upon investigation because it was concluded that Eaton had been engaged in appropriate resident care at the time.  (Id.)  Eaton does nothing to articulate any incidents other than these four.   The evidence supports the conclusion that between the DHS worker's visit to the facility in late August and Westgate's termination of Eaton on November 6, a period of roughly 10 weeks, Eaton was called into the office at least four times.

**Motion to Strike Specified Statements of Fact (Docket No. 13)**

Eaton moves to strike several of Kindred's statements of material fact.  I address them serially, or where appropriate, categorically.

*General Comment Regarding Concern over Record Citations*

On several occasions Eaton moves the court to strike statements on the ground that the record material cited by Westgate in support of a statement does not actually support the statement.  This is not a proper basis for filing a motion to strike.  The proper way for Eaton to deny the statement offered by Westgate and raise this objection in support of her denial, such as Westgate did in reply to certain of Eaton's additional statements.  If a statement is not supported by the cited portion of the record, the court will either disregard the statement or credit only so much of the statement as is supported by the record.

*Paragraphs 6-8*

Among the challenged statements are a group in which Westgate asserts that Eaton had trouble remaining alert on the overnight shift and was once observed sleeping.  (Statement ¶¶ 6-8.)  The factual assertions in paragraphs 6 and 7 concern annual performance reviews in which Eaton received constructive criticism to ask for coverage and take a break periodically to help stay alert during the overnight shifts.  Eaton disputes these statements on various grounds, including on the ground that the evaluations have not been properly authenticated and also based

on a lack of relevance.  (Opposing Statement ¶¶ 6-7.)  I have disregarded the statements

Westgate put forward in paragraphs 6 and 7.  I also observe that these two statements are

immaterial.  The constructive comments were made prior in time to the operative facts of this

litigation and Westgate does not even suggest that concerns over alertness or sleeping actually

contributed to its decision to terminate Eaton.

> As for paragraph 8, Westgate asserts the following:

> On October 9, 2002, Plaintiff received a written warning and one-day suspension
> because Plaintiff's supervisor found her sleeping on the job (Eaton Dep. Ex. 4).
> Plaintiff admits that she was sleeping on the job (Eaton Dep. 143).  Plaintiff's
> supervisor reported that she had difficulty arousing Plaintiff from her sleep
> (Brown Dep. 47).  Plaintiff's daughter Maria Wells confirmed in her deposition
> that she observed her mother sleeping on the job (Wells Dep. 108-10).

Eaton moves to strike the first and third sentences only, contending that the citations reference

only hearsay.  This point of contention is aimless because Eaton offers her own statement to the

effect that she was suspended in October 2002 for one day for sleeping at work.  (Additional

Statement ¶ 52.)  Moreover, Eaton conceded during her deposition that she was not on a break at

the time.  (Eaton Depo. at 144-45.)  Moreover, Ms. Wells testified that she personally observed

Eaton sleeping on the occasion in question.  (Wells Depo. at 108-10.)  Obviously, her testimony

concerning her personal observation is not hearsay.  The disputed facts surrounding how deep a

slumber Ms. Easton had achieved are pointless in the context of this dispute about whistleblower

retaliation because Westgate never contends that Eaton was fired for sleeping on the job.

*Paragraph 14*

> In paragraph 14 Westgate asserts:

> Ms. Mansell testified that following the confrontation with Plaintiff, she felt
> threatened by comments that Plaintiff made at work (Mansell Dep. 48).  For
> instance, Ms. Mansell testified that Plaintiff made comments of an intimidating
> nature in Ms. Mansell's presence, including comments that Plaintiff knew where
> Ms. Mansell lived and that Ms. Mansell's house had burned down many years ago
> (Id. 48-50).  Ms. Mansell also reported that she received a number of telephone

>calls at home and at work in which the caller would either hang up or not answer
>when Ms. Mansell picked up the phone (Mansell Dep. Ex. 1, p. 4).  Ms. Mansell's
>concern that Plaintiff was seeking to threaten her was heightened by the fact that
>on various occasions, she had heard Plaintiff openly boast that she had engaged in
>violent or threatening behavior in the past, such as slashing tires, stalking people,
>and placing sugar in gasoline tanks (Mansell Dep. 50, 82; Mansell Dep. Ex. 1, p.
>4).

Eaton moves to strike sentences three and four because the document identified as Mansell deposition exhibit 1 is unauthenticated, and therefore hearsay.  I have disregarded the third sentence, as requested.  I have included the fourth sentence in my fact recitation because it appears to be offered to show why Mansell was intimidated by Eaton and is supported by Mansell's deposition testimony and not merely by the documentary exhibit.  In any event, at the summary judgment stage, Eaton's testimony that she never made the statements attributed to her in the fourth sentence is to be credited over Mansell's contrary testimony.

### Paragraph 16

See General Comment, above.

### Paragraphs 19, 20 & 23

As to paragraph 19, the first two sentences of paragraph 20, and all of paragraph 23, the stated objection is hearsay.  However, it is apparent that Westgate is offering these statements not for truth of the matter asserted, but to describe the information available to Skirven that informed his decision to terminate Eaton.

### Paragraph 24

In paragraph 24 Westgate asserts its legitimate nondiscriminatory justification for terminating Eaton.  Eaton moves to strike this statement because, according to her, Skirven's evaluation that Eaton was a potential danger to her co-workers was based on "pure speculation." Obviously, a defendant employer must be permitted to state its reasons for imposing an adverse employment action on a plaintiff employee.  Furthermore, it is undisputed that Eaton's co-

workers were complaining of hostile and harassing behavior by Eaton.  This objection is overruled.

*Paragraphs 31 & 32*

Eaton moves to strike the second sentence of paragraph 31 and a footnote Westgate inserted in paragraph 32, both of which rely on statements contained in a DHS investigation report that is attached to defense counsel's declaration (Docket No. 10, Ex. J).  Eaton argues that the DHS report concerning the report of resident abuse and the ensuing investigation is inadmissible hearsay because it has not been properly authenticated.  Westgate essentially concedes the point in its opposition (Docket No. 21).  Accordingly, I have stricken the statements from my fact recitation.  Parenthetically, I observe that Local Rule 56 does not permit parties to assert a statement of material fact in a footnote.  Indeed, assertion of a fact in a footnote is a strong indication that the fact is immaterial to the dispute, as happens to be the case here.

**Motion to Strike the Declaration of David J. Kerman (Docket No. 14)**

Eaton separately moves to strike three paragraphs contained in the declaration of Westgate's counsel, David J. Kerman.  As a consequence of my treatment of the motion to strike specified statements of fact, specifically as it pertains to paragraphs 6-8, 14 and 31-32 of Westgate's statement of material facts, there is no real issue remaining with respect to the related portions of Mr. Kerman's declaration.  I would point out, nonetheless, that unless counsel have made an agreement about the authenticity or admissibility of a document, care should be taken to ensure that a document material to a summary judgment dispute is submitted in the form of a "sworn or certified copy" and as an attachment to an affidavit that adequately reflects the affiant's personal knowledge of the document and a sufficient basis in fact for the court to appreciate the authenticity of the document.  See Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir.

2000).  Although counsel might well be able to authenticate a copy of a document that is both
maintained by the opposing party and is produced by the opposing party during the course of
discovery, it does not appear that in this case that Attorney Kerman can properly authenticate the
DHS report about the Department's investigation or even his client's personnel records.

### Summary Judgment Discussion

A movant is entitled to summary judgment only "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of
the suit under the governing law," and the dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the
Court must view the summary judgment facts in the light most favorable to the nonmoving party
and credit all favorable inferences that might reasonably be drawn from the facts without resort
to speculation.  Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir.
1998).  If such facts and inferences could support a favorable verdict for the nonmoving party,
then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty,
LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Eaton's claim of retaliation arises under section 4572(1)(A) of the Maine Human Rights
Act (MHRA), 5 M.R.S.A. §§ 4551-4634, which provides both public and private employees with
a cause of action to redress workplace retaliation for an employee's exercise of rights afforded
under the Maine Whistleblower Protection Act (MWPA), 26 M.R.S.A. §§ 831-840.  The
MWPA, in turn, protects an employee from discrimination or retaliation when she has

complained in good faith to the employer or a "public body" about a workplace condition or activity that she reasonably believes is "a violation of law" or "would put at risk the health or safety of . . . any . . . individual," or when the employee in good faith reports "to the appropriate licensing, regulating or credentialing authority . . . what the employee has reasonable cause to believe is . . . a deviation from the applicable standard of care for a patient by an employer charged with the care of that patient." 26 M.R.S.A. § 833(1)(A)-(B) & (E). Neither the MHRA nor the MWPA has a requirement that the matter reported or complained of must actually be unlawful. Instead, an employee must have a reasonable belief that the employer's conduct fell into a protected category and must communicate his or her belief to the employer[3] in good faith. Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261-62 (1st Cir. 1999).

Because there is no direct evidence in this case that Westgate harbored a retaliatory purpose when it terminated Eaton, summary judgment analysis of Eaton's whistleblower claim must follow the familiar, burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Smith v. Heritage Salmon, 180 F. Supp. 2d 208, 216 (D. Me. 2002). Accordingly, the first order of business is for the plaintiff to establish that she can meet the elements of a *prima facie* case. "Under the MWPA, a plaintiff states a prima facie case if he shows (1) that [s]he engaged in an activity protected under the Act; (2) that [s]he suffered adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse action." Id. Should the plaintiff succeed in this endeavor, a presumption of retaliation arises and "the evidentiary burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for taking the adverse action against the

---

[3]       The MWPA requires that an employee provide an employer with notice prior to making a report to a public body, in order to afford the employer with a reasonable opportunity to correct the condition at issue. 26 M.R.S.A. § 833(2). However, this requirement is set aside where "the employee has specific reason to believe that reports to the employer will not result in promptly correcting the violation, condition or practice." Id. This issue is not raised in the pending summary judgment motion.

plaintiff." Id.; see also Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000). Once a non-retaliatory rationale is put forward by the defendant, the presumption of retaliation is dispelled and the burden returns to the plaintiff to demonstrate that the defendant's non-retaliatory rationale is a pretext for retaliation. Dominguez-Cruz, 202 F.3d at 430 n.5. The plaintiff may do so in a variety of ways, depending on the circumstances of her case, such as by showing that the employer's stated rationale was disparately applied or that the rationale is otherwise unworthy of credence. Chungchi Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003). If the plaintiff can generate a genuine issue of material fact as to the legitimacy of the defendant's non-retaliatory rationale, then generally summary judgment will be denied, id., "provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 n.5 (1st Cir. 1999); see also Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-P.R., 404 F.3d 42, 48 (1st Cir. 2005) (affirming entry of summary judgment in favor of employer where "the dozen perceived chinks in [employer's] reasons for terminating plaintiff let in no light as to any true reason [and did] not add up to the slightest suggestion of an effort to deceive or cover up a hidden motive").

Westgate argues that Eaton cannot satisfy element 3 of the *prima facie* standard because neither Mr. Skirven nor Ms. Brown had any knowledge that Eaton was the individual who reported the alleged abuse to DHS. (Mot. Summ. J., Docket No. 8, at 15-16.)[4] In her opposition memorandum, Eaton states in her factual summary that Skirven and Brown must have known it was she who made the report because she "did not keep it a secret [from] her co-workers that she

---

[4]       There is also an argument in Westgate's memorandum that Eaton's reporting of a co-worker to DHS in regard to alleged child abuse is not protected activity under the MWPA because it did not concern her employer's business activity. (Mot. Summ. J. at 14.) This argument appears to have persuaded Eaton; she makes no effort to respond.

had called the Department of Human Services to make the complaint." (Opp'n Mem., Docket No. 11, at 3.) A review of Eaton's statement of additional material facts will not yield a solitary statement, let alone a citation to sworn deposition testimony or other record evidence, in support of this assertion. The closest the additional statement of fact comes to this topic is at paragraph 55 wherein Ms. Eaton references the weekly trips to the office as proof that the management knew she had been the person who reported the alleged patient abuse. Later in her memorandum, Eaton asserts that she "spoke with her supervisor about the abuse," citing her statement of additional material facts, paragraphs 44-46. A review of those paragraphs will not reveal any statement indicating that Eaton spoke with a supervisor. Furthermore, a review of the underlying deposition testimony that Eaton cites in these paragraphs will reveal sworn testimony in which Eaton responds in the negative when asked whether she *ever* spoke with Ms. Brown about the matter. (Eaton Depo. at 184:4-6.) Eaton also asserts that Brown "suspected another employee, Annie Waldron[,] of making the report." (Additional Statement ¶ 68.) As for Mr. Skirven, Eaton similarly states that "Mr. Skirven thought that Annie Waldron had reported the abuse . . . ." (Id. ¶ 71.) In my view, this showing is insufficient to support a finding of a causal connection between the protected activity and the subsequent termination roughly ten weeks later.

Despite these serious concerns, Eaton asserts that "timing . . . can not simply be ignored." (Opp'n Mem. at 6.) To be sure, being terminated shortly after engaging in protected conduct is "strongly suggestive of retaliation." Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988); see also Fennell v. First Step Designs, 83 F.3d 526, 535-36 (1st Cir. 1996). However, chronological proximity will not by itself establish causality where the "larger picture undercuts any claim of causation." Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (quoting

16

Soileau v. Guilford of Me., 105 F.3d 12, 16 (1st Cir. 1997)).  In this Circuit, as in others,

plaintiffs who seek to prove retaliatory motive based exclusively on the timing of an adverse

employment action must have evidence reflecting "very close" temporal proximity.  Bishop v.

Bell Atl. Corp., 299 F.3d 53, 60 (1st Cir. 2002) ("If temporal proximity is the only evidence of

causality establishing prima facie retaliation, proximity must be very close; twenty months is

insufficient[.]"); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (holding

that even "the cases that accept mere temporal proximity between an employer's knowledge of

protected activity and an adverse employment action as sufficient evidence of causality to

establish a prima facie case uniformly hold that the temporal proximity must be 'very close'")

(citations omitted); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000) (holding

that temporal proximity alone will generally "be insufficient to establish the necessary causal

connection when the temporal relationship is not 'unusually suggestive'").  In my view, ten

weeks, is not so "very close" as to be "unusually suggestive" of retaliatory animus.  Other courts

have held that a three-month period is insufficient, in itself, to establish a causal connection

between protected activity and termination.  See Richmond v. Oneok, Inc., 120 F.3d 205, 209

(10th Cir. 1997).  If the court were to look to the date that Eaton allegedly made the report to

DHS (or the date the incident occurred), the timing here would likely meet or exceed the three

month mark.  At Eaton's request, I have counted only the weeks between the DHS worker's visit

to Westgate and Eaton's termination, which likely shortens the period by at least two weeks,

according to Eaton's testimony.  (Additional Statement ¶ 45.)[5]  Of course, the court is unable to

arrive at a more accurate timing calculation only because there is no evidence in the record

tending to establish that Eaton's supervisors knew that she had reported the incident.  Based on

my review, I doubt whether temporal proximity of ten weeks is enough to take Eaton over both

---

[5]       I am factoring in here the time it would take DHS to respond to Eaton's report.

the causation hurdle and the interrelated hurdle of proving that Westgate had knowledge that she

was the whistleblower.[6]  In any event, I am far more comfortable recommending that the court

enter a dispositive ruling based on the totality of the evidence in the case, including the evidence

put forward by Westgate as to its nonretaliatory motives for the termination.

According to Westgate, it terminated Eaton's employment "because it reasonably

believed that [Eaton's] behavior was creating a hostile, disruptive and intimidating work

environment for her co-workers." (Mot. Summ. J. at 18.)  Eaton's initial attack against this

proffer is that the court ought to discount entirely the testimony of Westgate's witnesses because

they are interested in the litigation.  (Opp'n Mem. at 8-9.)  Additionally, Eaton responds that

Westgate's rationale for firing her could be viewed as pretextual because she was a long-time,

above-average employee and because she was not given an adequate opportunity to respond to

her co-employee's complaints against her.  (Opp'n Mem. at 9.)  As to the former point, the

employer's burden with respect to presenting a legitimate, nondiscriminatory rationale for

terminating an employee is a burden of production, not persuasion.  Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  Throughout the McDonnell Douglas analysis

the burden of persuasion remains at all times with the plaintiff.  Id. at 143.  Westgate's rationale

---

[6]      Eaton experienced other disciplinary measures that might help advance her case under better
circumstances.  I have in mind here the one-day suspension she received for sleeping at her post and the verbal
warning she received for using vulgarity, both of which occurred within the ten-week window.  The problem I have
with factoring these two incidences into the analysis is that Eaton does not dispute that she engaged in the conduct
and she does not support a contention that she was being treated unfairly.  In particular, she does not assert that other
workers who were not disciplined for sleeping at work were observed sleeping while on the job rather than while on
break.  (See Additional Statement ¶¶ 51-53.)  As for the vulgarity issue, although she contends that Ms. Brown told
her she was "this far from losing her job," Eaton does not provide any perspective from which a factfinder might be
able to evaluate the relative offensiveness of her vulgar language within this particular workplace and she also fails
to provide any evidence tending to suggest that she was being treated differently from others with respect to the use
of vulgar language in the workplace. (See Opposing Statement ¶ 35.)  See Chungchi Che, 342 F.3d at 38-39
(discussing "discriminatory or disparate treatment in the time period between the protected activity and the adverse
employment action" as a way of proving both causation and pretext).  The visit to Brown's office based on Eaton's
absence from her post while assisting residents with showers apparently resulted in no disciplinary action against
Eaton because Brown concluded Eaton had done nothing wrong.  Eaton conceded that Brown was within her rights
to investigate a claim made by a co-worker that Eaton was leaving residents unattended.  (See Additional Statement
¶ 42; see also Eaton Depo. at 192-93.)

is adequately backed-up by admissible evidence in the form of, among other things, Skirven's and Brown's deposition testimony.  As for Eaton's positive work history and above-average competency, those characteristics cannot insulate her from discipline or negate the several contemporaneous reports by her co-workers that they were being intimidated by Eaton in the workplace.  Notably, the evidence that these co-workers actually raised these concerns over the summer and fall of 2002 is not limited to the testimony of Skirven and Brown.  Eaton herself acknowledges that her co-workers were raising these complaints about her.  Particularly, in paragraph 71 of her statement of additional material facts Eaton asserts that "Mr. Skirven did nothing to investigate or follow-up the allegations of the other employees and simply chose to believe their story over Ms. Eaton's."  Even if temporal proximity of ten weeks could overcome both the knowledge and causation hurdles at the *prima facie* stage, it does not contradict the contention that Eaton was terminated for creating a hostile environment at work, let alone generate an overpowering inference of retaliatory purpose.  Nevertheless, Eaton asserts that timing alone is sufficient to get her case before a jury.  (Opp'n Mem. at 10.)  Although timing can be highly probative evidence of discriminatory purpose, a ten-week timeframe is no silver bullet.  Precedent reflects that the significance of any particular temporal relationship is dependent on the particular circumstances of the case.  The facts in this case reflect that there was a significant erosion in the working relationship between Eaton and her co-employees within the ten-week window and that her co-employees had come to consider her a threat.  Both parties' factual statements reflect that Skirven credited the complaints of these co-workers and found them to provide adequate grounds for Eaton's termination.  Without evidence tending to controvert this non-retaliatory rationale for Eaton's termination, her evidence of retaliatory animus is limited to whatever inference a jury might draw from the existence of a ten week

temporal proximity between the DHS worker's visit to Westgate and her discharge from employment.  Assuming that temporal proximity of ten weeks is sufficient to carry Eaton over the *prima facie* threshold,[7] it is not sufficient to establish pretext.  Nor is it sufficient, in itself, to permit a jury to return a favorable verdict for Eaton on the ultimate question of retaliatory animus.

**Conclusion**

For the reasons stated above, the plaintiff's motions to strike (Docket Nos. 13 & 14) are sustained, in part, and overruled, in part.  Based on my review of the summary judgment record, I **RECOMMEND** that the court **GRANT** the defendant's motion for summary judgment (Docket No. 8).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  May 19, 2005

---

[7]       The court might enter summary judgment for Westgate based on a conclusion that the evidence presented does not establish causation under the *prima facie* test.  I have chosen to couch my recommendation within the context of the ultimate McDonnell Douglas test (whether there is a question of material fact concerning the existence of pretext or an actual retaliatory motive) only because the standard is more exacting in that it considers all of the evidence in the case.  On the question of *prima facie* causation, the First Circuit has cautioned that chronological proximity will not by itself establish causality where the "larger picture undercuts any claim of causation."  Wright, 352 F.3d at 478 (quoting Soileau, 105 F.3d at 16).